```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   VINCE BUONOMO, on behalf of himself  ) Docket No. 13 C 5274
     and others similarly situated,       )
 4                                         )
                                  Plaintiff,)
 5                                         )
                   vs.                     )
 6                                         )
     OPTIMUM OUTCOMES, INC.,               ) Chicago, Illinois
 7                                         ) July 28, 2014
                             Defendant.) 9:23 o'clock a.m.
 8
            TRANSCRIPT OF PROCEEDINGS - STATUS & MOTION
 9              BEFORE THE HONORABLE AMY J. ST. EVE

10   APPEARANCES:

11   For the Plaintiff:        BURKE LAW OFFICES, LLC
                               BY:  MR. ALEXANDER H. BURKE
12                             155 North Michigan Avenue, Ste 9020
                               Chicago, Illinois  60601
13
                               SMITHMARCO, P.C.
14                             BY:  MR. DAVID M. MARCO
                               205 North Michigan Avenue, Ste 2940
15                             Chicago, Illinois  60601

16   For the Defendant:        HINSHAW & CULBERTSON
                               BY:  MR. JOHN P. RYAN
17                                  MR. PETER E. PEDERSON, JR.
                               222 North LaSalle Street, Suite 300
18                             Chicago, Illinois  60601

19   Also Present:             MR. DOUGLAS FORREST, via telephone
                               MR. BRIAN CUTLER
20
     Court Reporter:           MR. JOSEPH RICKHOFF
21                             Official Court Reporter
                               219 S. Dearborn St., Suite 1232
22                             Chicago, Illinois  60604
                               (312) 435-5562
23              * * * * * * * * * * * * * * * * * *

24                   PROCEEDINGS RECORDED BY
                     MECHANICAL STENOGRAPHY
25               TRANSCRIPT PRODUCED BY COMPUTER
```

```
 1              (Whereupon, the following further proceedings were
 2          had in open court, in part via telephone conference, to
 3          wit:)
 4              THE CLERK:  13 C 5274, Buonomo vs. Optimum Outcomes.
 5              THE COURT:  Good morning.
 6              State your names for the record, if you would,
 7   please, before me.
 8              MR. BURKE:  Good morning, Judge, Alex- -- if
 9   Mr. Forrest would go ahead.
10              MR. FORREST:  I'm sorry.
11              Douglas E. Forrest, F-o-r-r-e-s-t.
12              MR. BURKE:  Alexander Burke for the plaintiff.
13              MR. MARCO:  Good morning, your Honor, David Marco
14   also for plaintiff.
15              MR. PEDERSON:  Good morning, your Honor, Pete
16   Pederson for the defendant.
17              MR. RYAN:  Good morning, your Honor, John Ryan on
18   behalf of the defendant.
19              MR. CUTLER:  Good morning, your Honor, Brian Cutler.
20              MR. BURKE:  Your Honor, we filed this morning a
21   status report.  ECF was down all weekend.
22              THE COURT:  Right.
23              And I did not get a copy of that, which I looked for
24   it early, early this morning.  You must have filed it --
25              MR. BURKE:  Around 6:00 o'clock, Judge.
```

1        THE COURT:  That was about when I looked.

2        (Document tendered to the Court.)

3        THE COURT:  Since I have not had the benefit of

4    reading this, why don't you tell me what the status is; and,

5    hopefully your ESI experts have made some progress.

6        MR. BURKE:  We've made some progress and we still

7    have some stumbling blocks, Judge.

8        We held a long meet-and-confer telephone call --

9    well, backing up, our last status was July 7th, and we were

10   ordered to meet and confer some more.

11       THE COURT:  Yes.

12       MR. BURKE:  The plaintiff sent a written request for

13   information on July 9th, and we have not received a written

14   response to that request.  The defendant -- the parties had a

15   telephonic meet-and-confer on Friday morning for over two

16   hours.  During that call, we learned some information; and,

17   that's the subject of the status report.

18       So, I'm just going to go down the bullet points on

19   the report.

20       First, we learned that as to certain wrong

21   number-type queries --

22       THE COURT:  Where are you on the report?

23       MR. BURKE:  Bullet Point 1 on Page 1, "Easy,

24   Information-Rich Queries."

25       THE COURT:  Okay.

1          MR. BURKE:  We learned that it is easy to search for

2     G2, to search for nined out and to search for agent wrong

3     number information.  Those are, as I understand it, boolean

4     queries to a single database or table; and, the computer can

5     spit out the results quite quickly and easily.

6          THE COURT:  Have those searches been completed?

7          MR. RYAN:  No, your Honor, and here's why --

8          THE COURT:  All right.  I am going to come back to

9     that.

10         Let us go ahead through the status.

11         MR. BURKE:  That's one thing that we learned.

12         Moving to Point 2 on Page 2, we learned Friday

13    morning for the first time that there are more auto dialers

14    that were used during the class period.

15         At the Downers Grove location, there was an Aspect

16    auto dialer that was used, as I understand it, between 2009

17    and when Livevox was begun in March of 2012.  We also learned

18    that the Raleigh location used an auto dialer, but neither

19    counsel nor the ESI liaison were able to tell us what it was

20    or how it worked.

21         Bullet Point 3, we learned -- we got a general idea

22    of how many accounts there were or are.  We understand that

23    there are 21 million accounts on the Downers Grove system and

24    35 million accounts on the Raleigh system.

25         This was Bullet Point 3.

1          However, when we asked what they meant when they told

2     us 21 million and 35 million, we didn't -- weren't able to

3     learn what that meant, whether it was live accounts or total

4     accounts.  There wasn't -- we weren't able to get that

5     information.

6          We still have almost no knowledge of the Raleigh

7     database.  We haven't received the schema, and we know next to

8     nothing about that database.

9          Point 5, there were two collector's manuals that were

10    produced:  One for Downers Grove; one for Raleigh.  The

11    Downers Grove manual was dated July 15th, 2014.

12          THE COURT:  What is a collector's manual?  Take a

13    step back.

14          MR. BURKE:  This is a manual that tells the

15    collectors how to use the computer system.

16          THE COURT:  Okay.  Okay.

17          MR. BURKE:  So, this manual, that's dated after the

18    last status hearing, does mention -- it does talk about how

19    the collectors are supposed to use the G2.

20          THE COURT:  Okay.

21          MR. BURKE:  However, we've made a written request the

22    day we received it for the historical manuals over the class

23    period, and we have not received those.

24          THE COURT:  What manuals do you have?

25          MR. BURKE:  We have a July, 2014, Cyclogic Bad Debt

1   Manual, which is the Downers Grove manual dated this year.

2   And, then, we have a manual for the 4D system, which we

3   understand to be from Raleigh.  That doesn't seem to have a

4   date.  It does say in the manual that the process for denoting

5   a wrong number is to delete that number or backspace the

6   number and then make a note in the accounts.

7           THE COURT:  Do you know if other manuals exist?

8           MR. BURKE:  We have asked for production of those

9   manuals and we haven't received them.  I don't remember

10  whether it was -- whether we have been told whether they exist

11  or not.

12          THE COURT:  Okay.

13          MR. BURKE:  The manuals were also produced in

14  printed-out and then scanned PDF format, so that we can't

15  search them or read much of the stuff that's in there.

16          Point 6 on Page 3, there is a missing call record.

17  We've alleged since the beginning of this case that the

18  plaintiff received at least one call after a request not to

19  receive any more calls.  The original documents that were

20  produced by Optimum seem to rebut this and showed no calls

21  after the log calls stop -- requests to stop calling.

22          However, when the Livevox documents were produced, we

23  see that there is a call after the request to stop calling in

24  the Livevox documents.  That corroborates what's in our

25  complaint.

1          We asked counsel to explain what happened to that

2     data, which we view as important to understanding what we're

3     getting and what we're not getting.  And it was explained that

4     there might have been something cut off when they produced

5     screen prints.  This morning, in the hallway, I learned that

6     that probably isn't true; but, there's still no explanation of

7     what happened.

8          Point 7 on Page 3, Data Preservation.  We had a

9     meet-and-confer with Livevox's General Counsel on July 22nd

10    and also outside counsel, and it was explained to us that

11    Livevox keeps records for two years and then they archive and

12    compress it.  During the phone call, we asked whether Optimum

13    had taken steps to preserve and prevent the compression of the

14    call data having to do with this case and we did not receive

15    any response, any information.

16         THE COURT:  If it is archived and compressed, is it

17    not accessible, then, or is it accessible with a little more

18    work?

19         MR. BURKE:  Accessible with cost, is my understanding.

20         THE COURT:  Okay.

21         Do you have any sense of the cost involved?

22         MR. BURKE:  I don't.

23         And we have another meet-and-confer scheduled with

24    Livevox, I think, next week to follow up on the points with

25    regard to Livevox.  For example, Livevox told us that they

1　have this thing called a voice portal, which is like an

2　Internet access for all their customers, where the customer

3　can access database information about the calls for that

4　customer and also can access things like manuals that explain

5　how Livevox works.

6　　　　Now, none of those manuals have been produced.  And

7　Livevox is objecting to produce them because they say that

8　Optimum has access to them and should just produce them.  So,

9　we're working with both Optimum and Livevox to obtain those

10　materials.

11　　　　With regard to free-form notes, Bullet Point 8 on

12　Page 3, our understanding of what Downers Grove collection

13　agents are supposed to do when they understand there's a wrong

14　number is to mark a G2 T code designation.  They're also

15　supposed to nine out the number -- the phone number.  Then

16　they're supposed to do a dropdown box on this Livevox tool bar

17　which codes the phone number as a wrong number with Livevox's

18　database.  And, then, they're supposed to type in a notation

19　that says this is a wrong number.

20　　　　And it's that notation that does not appear to be as

21　easy as the other data to obtain.  We've asked for information

22　about how to more easily obtain it, and we are waiting for

23　that information.

24　　　　The remainder of the status report goes through what

25　our understanding of the defendant's proposal for going

1    forward is and what our proposal is for going forward.

2           THE COURT:  Okay.

3           Again, I have not had the benefit of --

4           MR. BURKE:  Right.

5           THE COURT:  -- reading this.  So, why don't you tell

6    me briefly what your proposal is, and then I can talk to

7    defendant about this.

8           MR. BURKE:  Well, because there are multiple

9    redundant ways of tracking wrong numbers in the Downers Grove

10    system and also on the Livevox system, we would propose

11    production of all the G2, all the 99 and all of the agent

12    wrong number materials arising out of the Downers Grove

13    collection system where there's a call during the class

14    period.

15           THE COURT:  What is the purpose of this?  To identify

16    the class members?

17           MR. BURKE:  Identify the class members and to --

18    also, it will have a dual purpose of showing us what free-form

19    notes were used for wrong numbers.  So, even though there's a

20    G2, there should be the redundant collection note that says --

21    maybe they typed out "wrong number" or maybe they typed out

22    "WRG NBR."

23           We asked for that -- a list of abbreviations.

24           THE COURT:  So, you want the G2, the 99, the agent

25    wrong material numbers and any handwritten notes?

1      MR. BURKE:  The handwritten notes, I think, we still

2  need to talk some more about with the ESI liaisons.

3      THE COURT:  Okay.

4      Then how -- where would these free-form notes show up

5  if you do not get the handwritten notes?

6      MR. BURKE:  We would -- so, if you pull all the G2

7  accounts, production of those materials would include the

8  handwritten notes for those G2 accounts.  And we would be able

9  to look through those handwritten notes and see how the

10  collection agents typed out "wrong number" because these are

11  redundant notations in the system.

12      THE COURT:  Okay.

13      MR. BURKE:  And that will at least give us another

14  step forward in terms of getting the -- I'm skeptical as to

15  whether there are very many wrong numbers where the only

16  denotation is a handwritten note, because there's so much

17  redundancy in the recordkeeping.  But, hopefully, this will

18  put us a step in the right direction.

19      THE COURT:  Do you have any sense of the volume that

20  would be responsive to your proposal?

21      MR. BURKE:  We asked for that information directly in

22  writing on July 9th, and we have not received a response.

23      THE COURT:  Tell me, again, the class period that you

24  are asking for this over.

25      MR. BURKE:  We're almost at the year -- we're just

1   past the year anniversary of the case.  The class period is

2   four years.  I believe it's July 23rd, 2009, to the present.

3           THE COURT:  Okay.

4           Anything else for your proposal that you want?

5           It looks like you have some more meet and confer.

6           MR. BURKE:  Yeah.  I mean, what we would request is

7   just cooperation in telling us information that we've asked

8   for that will help us figure out how to receive production of

9   the handwritten note materials.

10          There has been a pattern of us requesting specific

11  materials in writing and then objections to production of

12  those materials.  And that's frustrating for us.

13          THE COURT:  Okay.

14          So, let us go to you.

15          Mr. Ryan, are you going to handle this?

16          MR. RYAN:  Yes, your Honor.

17          THE COURT:  Okay.

18          So, let us go through the report.  Do you have a copy

19  of this?

20          MR. RYAN:  I do, your Honor, yes.  I printed it up.

21          THE COURT:  All right.

22          Category 1, "Easy, Information-Rich Queries."

23          MR. RYAN:  Your Honor, I have no problem going with

24  these point by point, but the procedural history as to why

25  we're here today was a little off base, meaning two things.

1    If you'd like to start here, I have no problem starting here.

2              THE COURT:  You can add.

3              I am aware of the procedural history before the

4    Court.

5              MR. RYAN:  Right.

6              THE COURT:  If there is more you want to add, go

7    right ahead.

8              MR. RYAN:  Yes, your Honor.

9              The first point is that the idea that the G2s and the

10   999 accounts are going to identify the class is wrong because

11   this is a wrong number case.  So, in the G2s, you'll see just

12   a wrong number in the client notes.  So, all they have is a

13   wrong number.  There is no person's name, address or anything

14   like that.  They then have to take another step, find out who

15   that wrong number belongs to at the time the call was made.

16   We've been telling them that.

17             THE COURT:  Well, it would help them identify the

18   class, though.

19             MR. RYAN:  Yes, yes, yes.

20             THE COURT:  Unless you have an easier way to get

21   right to the person's name and number.

22             MR. RYAN:  No, your Honor, but we have an easier way

23   to prove that all this is going to be difficult for him to

24   identify a class, let alone prove that a class exists.  And

25   what we want to do is show him that in a sampling.

1          So, last time we were before your Honor we talked

2    about a sampling --

3          THE COURT:  All right.  You are getting to the end

4    now.  So, if there is more procedural history you want to add,

5    go ahead; and, then, let us go through this category by

6    category.  And I will hear your proposal when we get to the

7    end.

8          MR. RYAN:  Okay.

9          In terms of 1(a), (b) and (c), they can be searched

10   and they can be identified.

11         THE COURT:  What type of volume or work are we

12   talking about to do that?

13         MR. RYAN:  1(a), (b) and (c) can be done.  They can

14   be searched.  The volume will be rather large by that

15   because there's --

16         THE COURT:  What do you mean by "rather large"?  Your

17   idea of large and my idea of large and Mr. Burke's idea of

18   large may all be very different.

19         MR. RYAN:  I don't have an actual percentage because

20   we haven't ran the search yet because when we got the

21   correspondence, we said, "What in this correspondence do you

22   need to talk about a sample size?"

23         And Mr. Burke says, "I need all the information for

24   my -- to discuss a sample, whether a sample is practical, and

25   my motion to compel."

1    And I was like, "The Judge ordered us to talk about
2 what you need for sample size.  She asked us to produce
3 manuals.  We did that.  She asked us to produce the table
4 schemas.  We did that.  Just tell me what you need in order to
5 proceed with the sample."
6    And we had a week-and-a-half of e-mails wherein
7 plaintiff still says he doesn't have to do a sample.  So --
8 and the other thing where a lot of these go to, your Honor, is
9 a targeted sample where it's just G2 and the 999s.  And we
10 talked about that last time we were here, where you said you
11 can't possibly do a targeted sample because their own ESI
12 liaison said you're going to leave people out.
13    So, now they've added in, "Well, okay, give us the
14 five searchable terms for wrong numbers."
15    And we said, "Okay, fine.  If that's what you want,
16 I'll find you five searchable terms."
17    They admit that even if we give them five searchable
18 terms, that it's only a reasonable likelihood that we can find
19 the class members.  We're not going to find them all.  So,
20 we're going to leave class members out.
21    And the most important point in all this, your Honor,
22 the reason why we want to do a sample, is we want to show
23 that, again, debtors lie.  But I'll go back to the --
24    THE COURT:  Yes, you are going back to the --
25    MR. RYAN:  I'll go back to --

1          THE COURT:  -- end.

2          So, let us go through these, and then I will hear

3     your proposal at the end.

4          MR. RYAN:  In terms of No. 2, your Honor, there is a

5     different dialer in Downers Grove called Aspect, that was used

6     prior to 2012 with Livevox.  That was not learned just during

7     our call on Friday.  But the plaintiff in this case was called

8     via Livevox, and that's what we're trying to target this for.

9     And his class definition is defined as those called by Livevox

10    or similar system.

11         THE COURT:  Okay.

12         MR. RYAN:  We can go into these other issues as to

13    what the capabilities of these other dialers are and what

14    they're not; but, again, that's going to take it to a

15    sideshow.  I'm really trying --

16         THE COURT:  Let us focus on Livevox since that is the

17    proposed class.

18         Number of accounts, No. 3.

19         MR. RYAN:  No. 3, your Honor, the number of --

20         THE COURT:  21 million and 35 million -- one in

21    Downers Grove; one in Raleigh.

22         Do you have any sense of if these are all live

23    accounts, if these are duplicative numbers or what this

24    represents?

25         MR. RYAN:  Your Honor, this represents all the

1    accounts in the system.  However, the Downers Grove office

2    grew significantly after 2009.

3         So, of the 21 million, your Honor, I would give you

4    an estimate, but it would be speculating.  But I'm looking to

5    get that number.

6         That was the other thing that we've talked about, is

7    whether I want to -- whether we should identify the accounts

8    that were open past the class period or whether there were

9    calls made.  But then it's going to turn into this -- another

10   sit down for two hours and talk about a search.

11        THE COURT:  So, these numbers represent all open and

12   closed accounts?

13        MR. RYAN:  Yes, your Honor.

14        But, your Honor -- so, I don't want to switch to the

15   end.  I know I'm flip-flopping on you a little bit.  However,

16   last time we were before you, their ESI liaison brought up the

17   idea of a statistically relevant sample.  And I believe he

18   said it was Statistics 101 that he needs to know the entire

19   universe of the accounts.  Well, we've learned that Mr.

20   Forrest is not a statistician.  He didn't represent that he

21   was, but we learned that he is not a statistician.

22        However, I did some digging myself.  And I'm not a

23   statistician, but they now have this thing on the Internet.

24   It's a relevant sample calculator, where you can plug in the

25   number and instead of taking a 95 percent variable, you can

 1   actually increase it to 99 percent, which I did, with a

 2   plus-minus of three percent rather than five percent, which

 3   most surveys are done on.  And you know what the number came

 4   out to be?  1,849.  Whether I did it at 50 million, 20

 5   million, 7 million, the number came out 1,849.  And the reason

 6   being is the overall universe does not matter when you're

 7   talking about millions of accounts in terms of a relevant

 8   statistical analysis.

 9            THE COURT:  Okay.

10            Let us go to No. 4, "Limited Raleigh Information."

11            MR. RYAN:  Your Honor, we've had several discussions

12   with them about the limited -- about the Raleigh information.

13   In fact, we produced the manual for the Raleigh information.

14   We're willing to produce -- in this sample, the way I'm

15   looking at this sample -- and we've told him, "We'll data dump

16   it into whatever you want to search.  Tell us what information

17   you need that you don't have that you can't search."

18            My ESI liaison has told me they have everything that

19   they need if you were to do a sample to search data to

20   identify wrong numbers.

21            THE COURT:  The representation in No. 4 here is that

22   the computer coding in the manual that you turned over was not

23   generally used in Raleigh to identify wrong numbers.

24            Is that correct?

25            MR. RYAN:  No, your Honor.  That's absolutely wrong.

1            THE COURT:  Okay.

2            MR. RYAN:  Because --

3            THE COURT:  Why don't you clarify the record then.

4            MR. RYAN:  Sure.

5            On Page -- it would be Bates Page 346.  This is what

6   we talked to opposing counsel about.  They backspace out the

7   number.  And by backspacing out the number, they then put an

8   entry sometimes that says "wrong number."  Other times they

9   don't.

10           THE COURT:  Is that what the written policy calls

11  for?

12           MR. RYAN:  The written policy calls to say "wrong

13  number" or any abbreviation thereafter.  But if you just

14  backspace out the number, it serves the same purpose of not

15  calling that number.

16           THE COURT:  If you backspace out the number, does the

17  number appear somewhere or can you pull that number out or is

18  it gone forever?

19           MR. RYAN:  No.  If you just do it the way the manual

20  does it, it's gone forever.

21           THE COURT:  Okay.

22           If you backspace out the number, is there any way for

23  you to retrieve from your client that number?

24           MR. RYAN:  I don't believe so, but I will defer to

25  the expert.

1          MR. CUTLER:  No.  Once they space back, the numbers

2   just delete or remove from the database.

3          THE COURT:  Okay.

4          MR. BURKE:  Although it would appear in the Livevox

5   call data.

6          THE COURT:  Assuming somebody put it in.

7          MR. BURKE:  Well, we're only interested in files

8   where there were calls.  So, assuming that somebody denoted it

9   in the handwritten notes on the Raleigh system that there was

10  a wrong number, we could cross reference that with the --

11         THE COURT:  That is what I mean.  Assuming

12  somebody --

13         MR. BURKE:  Yes.

14         THE COURT:  -- put in that it was a wrong number.

15         MR. BURKE:  Yes.

16         THE COURT:  If it was backspaced and nobody put in

17  that there was a wrong number, then you cannot find it.

18         MR. BURKE:  It would just -- I guess it would just be

19  gone.

20         THE COURT:  Okay.

21         MR. BURKE:  Unless there's an audit trail or

22  something, but I guess -- we haven't gotten this far in

23  discussing the Raleigh system.

24         THE COURT:  Okay.  Let us go to No. 5, the Downers

25  Grove collector's manual.

1              Are there -- you turned over manuals.  It looks like

2    they are 2014 manuals.

3              MR. RYAN:  Yes, your Honor.

4              THE COURT:  Are there prior manuals?

5              MR. RYAN:  There are prior manuals.  What I've been

6    told, your Honor -- and I told opposing counsel this -- what

7    it is, is they continuously update their manual over time and

8    they don't save the previous manuals because they want the

9    constant current version manual to be out there.

10             THE COURT:  So, there are no copies of prior

11   current manuals -- prior -- not current, but prior manuals?

12             MR. RYAN:  Your Honor, I've asked.  However, what

13   I've been told was since they've used Livevox, that part of

14   the manual has not changed.

15             THE COURT:  Okay.  That was my next question.

16             Has not changed since when?

17             MR. RYAN:  Since when they began using Livevox.  But

18   even prior to using Livevox, it's my client's understanding --

19   and I can verify this -- that G2 was also used.

20             MR. BURKE:  Judge, the revision date on this document

21   is after your Honor ordered it to be produced and after we

22   asked for it to be produced in writing.  Our discovery --

23   yeah.

24             THE COURT:  You should get an affidavit from

25   somebody --

1          MR. RYAN:  Okay.

2          THE COURT:  -- and turn it over within one week to

3   plaintiffs, verifying that the manual with respect to Livevox

4   and how to handle wrong numbers has not changed since its

5   inception.  Someone with personal knowledge.

6          MR. BURKE:  We've also asked that they produce the

7   native file -- ostensibly a Word document -- that was modified

8   last week.

9          THE COURT:  No. 6, "Missing Call Record."

10         MR. RYAN:  Sorry, your Honor, I was just taking --

11         THE COURT:  No, that is --

12         MR. RYAN:  -- a note here.

13         THE COURT:  Finish writing and then let me know.

14         "Missing Call Record."

15         MR. RYAN:  Your Honor, it was raised to us by

16  opposing counsel that there is the last call record -- let me

17  back up for a second.

18         I've come before your Honor several times and they

19  kept saying that this call occurred in November.  And I said

20  it couldn't possibly have occurred in November because we

21  didn't get the account until February.  So, the idea that

22  there was a call after they told us to stop calling -- which

23  is consistent with their second amended complaint -- is

24  categorically wrong because there was no call in November.

25         THE COURT:  So, the call was on June 7th --

1          MR. RYAN:  That's correct, your Honor.

2          THE COURT:  -- 2013?

3          MR. RYAN:  That's correct.

4          THE COURT:  And it is your representation there were

5    no additional calls?

6          MR. RYAN:  It's my representation right now, your

7    Honor -- and I'm still investigating it -- that the Livevox

8    system does report a call after they called in, but that call

9    from -- the subsequent call from -- Livevox does not show up

10   on the account notes.  And I don't know why.

11         THE COURT:  When did that subsequent call take

12   place --

13         MR. RYAN:  The --

14         THE COURT:  -- from Livevox that does not show up?

15         MR. RYAN:  There was a call at 3:46, and I believe

16   that was an incoming call saying you have the wrong number.

17   And, then, there was a call at 3:58.

18         THE COURT:  So, the same day?

19         MR. RYAN:  Same day, 12 minutes -- within -- I don't

20   want to say 12 minutes.  Might be 15 minutes.  But within 20

21   minutes apart.

22         THE COURT:  Do you know why that information is

23   missing with respect to that second call?

24         MR. RYAN:  It's only missing in the account note,

25   your Honor.  It is in the Livevox report -- call report --

1   which my client produced.

2           THE COURT:  So, it is missing in which document?

3           MR. RYAN:  The account notes.

4           THE COURT:  Okay.

5           Did it exist in account notes originally?

6           MR. RYAN:  I don't believe so, your Honor.

7           THE COURT:  All right.

8           No. 7, "Data Preservation."  Livevox keeps this

9   apparently for two years and then it is archived.

10          Do you want to add anything with respect to this or

11  any efforts -- before this lawsuit or once this lawsuit was

12  filed, any efforts -- your client has undertaken to obtain

13  that data?

14          MR. RYAN:  Your Honor, I'd like to add two points.

15          Yes, Livevox was told that this lawsuit existed.

16  And, additionally, opposing counsel knew that Livevox was the

17  provider a long time ago, way before the two-year period to

18  compress data existed.  So, I mean, this can't be all placed

19  on me.

20          But I think the compressed data is only for a couple

21  of months, and that can still be retrieved.  By that "only for

22  a couple months," off the top of my head, I think the contract

23  was signed in March, 2012, and the compressed data goes back

24  to July -- or the non-compressed data goes back to now 2014.

25          THE COURT:  Say that, again.

1      MR. RYAN:  Let me say it another way.

2      The compressed data that they were talking about only

3   exists for a couple of months --

4      THE COURT:  Couple of months.  All right.

5      MR. RYAN:  -- because of -- the Livevox contract

6   began in March of 2012.

7      THE COURT:  So, the compressed data is only March

8   through July?

9      MR. RYAN:  Correct.

10      THE COURT:  Okay.

11      Free-form notes.  You said you are going to keep

12   talking on that, so we can skip over that.

13      MR. RYAN:  Your Honor, if I may?

14      THE COURT:  Sure.  Go ahead.

15      MR. RYAN:  I think there's a reason why they wanted

16   to skip over this.  Because at the last hearing, this was the

17   whole idea.  This was the problem, is we could never identify

18   all the wrong numbers.  And their letter even admits that.

19      Their letter says the more searchable terms they give

20   you -- their ESI liaison agreed with my liaison.  The more

21   searchable terms they give us, the more difficult it will be

22   on my client to identify all these alleged wrong number

23   accounts.

24      Additionally, if we were to do these phrases, they

25   concede in their letter to us that it's not possible to get

 1   every form of wrong numbers because humans use --

 2          THE COURT:  Different --

 3          MR. RYAN:  -- different abbreviations.

 4          THE COURT:  Okay.

 5          MR. RYAN:  And without doing the search for the wrong

 6   number terms and the G2s and the 99s, you don't have the

 7   universe of the alleged wrong numbers.

 8          THE COURT:  Okay.

 9          Before I get to the next step, which is your

10   proposal, I have another case that some lawyers have been

11   waiting here since 8:30 because one of the lawyers was late.

12   I am going to pass you and come back to you because we still

13   may take a little bit of time.

14          MR. BURKE:  Thank you.

15          MR. RYAN:  Thank you, your Honor.

16          THE COURT:  So, do not go away, though.

17          (Whereupon, the Court gave its attention to another

18       matter, after which the following further proceedings

19       were had in open court, at 10:02 o'clock a.m., to wit:)

20          THE CLERK:  13 C 5274, Buonomo vs. Optimum Outcomes.

21   Recalled.

22          MR. BURKE:  Alexander Burke for plaintiff, and we

23   have Douglas Forrest, ESI liaison, on the phone for plaintiff.

24          THE COURT:  We have got your names.  We do not need

25   them, again.

 1          MR. MARCO:  Your Honor, is it possible to just
 2     confirm that Mr. Forrest is still with us on the line?
 3          THE COURT:  Are you still there, Mr. Forrest?
 4          MR. FORREST:  Yes, I am, your Honor.
 5          MR. MARCO:  Thank you, Judge.
 6          THE COURT:  So, Mr. Ryan, you were about to go into
 7     your proposal of how to go forward.
 8          MR. RYAN:  Yes, your Honor.
 9          I may have given a road map in --
10          THE COURT:  I know what you are going to suggest -- a
11     statistical sample -- but go ahead.
12          MR. RYAN:  Yes, your Honor.
13          THE COURT:  And tell me what that sample would look
14     like and how you would obtain it.
15          MR. RYAN:  Sure.
16          The sample would look like we can get a thousand
17     accounts from Downers Grove, we can get a thousand accounts
18     from Raleigh and, then, turn those accounts over to the
19     plaintiff when we dump them into a system that they can
20     search.
21          My ESI liaison tells me that he could dump it into
22     like -- forgive me, I'm not a techie, but something like an
23     Excel, but it's not Excel; and, if they wanted to find all
24     G2s, they could type in "all G2s."  In fact, we could even
25     identify the G2s for them.

1          But if they wanted to search the text of the account

2    notes --

3          THE COURT:  And would these be randomly selected

4    account notes?

5          MR. RYAN:  Yes, your Honor.

6          THE COURT:  Randomly selected during the class

7    period?

8          MR. RYAN:  Yes, your Honor, for the class period of

9    Livevox -- from Livevox -- of 2012.

10         THE COURT:  And would they -- would you focus on

11   accounts -- wrong number accounts -- whether they are G2,

12   nined out or otherwise?

13         MR. RYAN:  No, your Honor, but -- we could do that,

14   but here's the problem with doing it that way.  The problem

15   with doing it that way is you're never going to get the total

16   picture as to what's in the account notes.

17         For example, if I produce a thousand accounts and

18   they identify the G2s and 999s and they run a sample of wrong

19   numbers on five different wrong numbers, we'll have to go

20   through them manually and then we'll identify additional wrong

21   numbers.

22         If I were only to produce G2s and 999s and their five

23   search terms or whatever, you would never find those

24   additional account notes that don't follow that free-form

25   indicia of wrong number.  So, in essence, you wouldn't be

1   getting the clear picture as to what we're doing here in terms

2   of the account notes.

3           THE COURT:  Well, if they are trying to identify the

4   class here and not just the percentage of wrong number calls,

5   how is -- I can see where the statistical sample would give

6   them the percentage of wrong numbers because if you pull a

7   thousand accounts and five of those have wrong numbers or ten

8   of those -- or whatever the number is -- and you turn over

9   that information and they can identify the callers and

10  identify those class members, then -- and you are shaking your

11  head "No," but how is that helpful to them?

12          MR. RYAN:  Well, your Honor, I started nodding my

13  head a little bit because they don't identify the class

14  members because they're wrong parties, but I understand --

15          THE COURT:  You have to go -- but they can work

16  backwards and get the class members.

17          Once you have the phone number, they can work

18  backwards and try to get the identification of the holder of

19  that number.  No?

20          MR. RYAN:  Well, they can trace -- try -- they can

21  run a skip trace to try to get it back to when the subscriber

22  of the telephone number was called; but, in order to get

23  there -- this is going to go more into class certification,

24  but in order to get there -- you're going to have to pick up

25  the phone and call the person and say, "Did you get this

1    call?"

2          Because you're never going to know the name.  The

3    name's not in the account notes.  And the reason why the

4    name's not in the account notes, for example, if I get --

5          THE COURT:  They can subpoena the service provider or

6    Google or --

7          MR. RYAN:  Yes.

8          THE COURT:  Half of this will come up on Google.

9          MR. RYAN:  You could subpoena the service provider.

10   And that's our point.  And that's what plaintiff has done in

11   this case.  They actually subpoenaed Mr. Buonomo's service

12   provider.  So, we have to subpoena every --

13         THE COURT:  They would have to.

14         Okay.  So, let me -- come back to the statistical

15   sample.

16         MR. RYAN:  Sure.

17         THE COURT:  Why is this sufficient to get them what

18   they want?

19         MR. RYAN:  Well, your Honor, because if it --

20   simplicity's sake, say, if there's a thousand accounts and 50

21   of them are wrong numbers, if, say, ten of those 50 were

22   actually found when we did our manual review, the statistics

23   remain the same.  One in five of your alleged wrong numbers

24   are actually found.  You're leaving out 20 percent of the

25   wrong numbers because we actually had to go back and manually

 1   review them.

 2          Additionally, if of those 50 we also find five or ten

 3   people who actually lied and said no -- you know, one day you

 4   called and they said, "Wrong number," two days later they call

 5   in and now they're on a payment plan, that kind of information

 6   is in our account notes.  And, so, that would also show you

 7   two reasons why the class would not be certified.

 8          MR. PEDERSON:  Two points, your Honor, if I could

 9   just amplify on what Mr. Ryan is saying.

10          If we only produced a random sample with meeting

11   criteria for G2 or nine outs, the sample will be

12   unrepresentative and under-inclusive because it may not

13   include people who have indicia of a wrong number having been

14   called in the free-form notes.  So, in other words, the

15   indicia is only in the free-form notes, but not in the G2 or

16   the 999 indicia, which is in the database table.

17          And then -- so, the better approach would be to

18   produce a sample of a thousand accounts not limited to G2 or

19   999, and then plaintiff's counsel can do data analysis and

20   say, "All right, well, here's an indicia of a wrong number,

21   G2, and then here's a free-form note which contains an indicia

22   of a wrong number; but, for that account there is no indicia

23   of a wrong number based on the G2 or 999 selection."

24          In any event, we have a random sample that will not

25   be under-inclusive in the way a targeted sample would be.

1          And once we get the numbers that are -- allegedly

2  were wrong numbers, then plaintiff's counsel can say, "Well,

3  the people corresponding to these numbers, if we can somehow

4  identify who was a subscriber to the number on the date of the

5  call, is our potential class list."

6          And, of course, we're not going to agree that that

7  class meets any of the requirements for class certification,

8  because of a number of individual issues and mini-trials that

9  would be necessary.

10         MR. RYAN:  And, your Honor, just to expand on that

11  point --

12         THE COURT:  But carry through with me where -- so, we

13  do this random sample and we come up with these different

14  categories.  That still is not going to give them the full

15  scope of what they believe the class is.  So, where do you go

16  from there?

17         Where do you go, under your proposal, from the

18  statistical sample?  Are we just going to be back at going

19  back through the G2s and the nine outs and --

20         MR. RYAN:  No, your Honor, because the ESI Principle

21  1.03 is all about proportionality, and proportionality is

22  vital.  And that's why we filed the motion to stay, to try and

23  stop this case while the FCC determines whether wrong party

24  calls are actually a violation or whether there's a good-faith

25  defense.

1    But the Court asked us to produce with ESI because in

2    terms of -- if we do a sample, they -- if they take a sample

3    and they have a thousand calls and they identify 50 wrong

4    numbers and they prove that everything I have been telling

5    your Honor since Day One is wrong, that every one of those

6    calls is in there of their 1,000 sample and every one of those

7    calls is a wrong number and nobody lied, I'm kind of stuck.

8    THE COURT:  But stuck and then, what?  Then they get

9    all the nine outs and the G2s?

10    MR. RYAN:  Well, your Honor, then we'd have to go and

11    we could give them the G2s and the nine outs, but then they'd

12    also have to do the search.

13    But my point with the sample size is I'm not stamping

14    my feet and saying -- digging my feet in the sand with 1,000

15    accounts.  What we were supposed to talk about during our

16    conference was to give me a number, let me know a percentage.

17    I've asked all those -- I've asked all those

18    questions.  What percentage of all the accounts do you want?

19    What number do you want?  At some point it's too much because

20    you can't manually go through those accounts.  And I can never

21    get a number.

22    MR. PEDERSON:  I believe a sample would be sufficient

23    for plaintiff's counsel to make the argument that the

24    information in the data is sufficient for the Court to

25    identify a class that meets the Rule 23 requirements.  You can

1    do it with a sufficiently large sample that covers the

2    variation in the accounts that were called or you can do it

3    with the entire population, but there's no reason to do it

4    with the very burdensome and expensive route of making the

5    analysis based on the entire population when a sample is

6    sufficient.

7         MR. BURKE:  Judge, Point 1, "Easy, Information-Rich

8    Data."  The defendant has told us that it can do the search

9    for G2, the nine out and the Livevox agent wrong number data

10   extremely easily.  The defense --

11        THE COURT:  I am not sure they have said that.

12        MR. BURKE:  They told us that during the meet-and-

13   confer.  They used the word "easy."

14        THE COURT:  Is it easy to pull that information and

15   cheap?  Well, nothing here is going to be cheap.

16        But is it easy and how much more expensive would that

17   be, if at all, than doing a statistical sample?

18        MR. RYAN:  Well, your Honor, it depends on if it's

19   just G2 and 999 or if we do the word search.  As the Court

20   recognized at our last hearing, the G2 and 999s are reflective

21   of wrong numbers, but it's under-inclusive; and, that's why

22   the Court told opposing counsel that even his own ESI liaison

23   says it's under-inclusive.

24        THE COURT:  I remember.  I remember.

25        MR. RYAN:  So, that's why we have to do this free-

1    form note search.

2           MR. BURKE:  I mean, our proposal is to produce now

3    what's easy to produce and, then, work on the free-form note

4    stuff.  It seems to make sense to me.

5           I mean, we have -- what we're dealing with, with this

6    free-form note stuff, is a party who has not followed its own

7    procedures for keeping track of incidents in its own database.

8    That's the reason the free-form note is even at issue, is

9    because people forgot.

10          THE COURT:  I am not sure that is right.  I am not --

11          MR. BURKE:  Well, there's --

12          THE COURT:  -- sure that is right.

13          MR. BURKE:  There's multiple redundancy, Judge.

14   There's four ways of keeping track of the wrong number.  It's

15   G2 -- and every time it happens they are supposed to do all

16   four:  G2, nine out, tell Livevox, and then make the free-

17   form notes.

18          And the free-form notes, I think, is going to be an

19   extraordinarily -- should be an extraordinarily -- small

20   subset of the accounts that are going to be at issue here.

21   But our proposal --

22          THE COURT:  But they still have to search through

23   everything under your proposal, whether it is a small number

24   or not.

25          MR. BURKE:  But the difference with the -- between --

1    and I think counsel was just explaining this.  The three

2    categories that we're requesting immediately is a much easier

3    type of search because it's a "Yes"/"No" trigger.  It's a

4    boolean trigger within the database.  The free-form notes is a

5    search for a string of characters within a giant table, and

6    that takes longer and is more burdensome.

7           And what we want to do is meet and confer as to how

8    it makes sense to make the table of free-form notes smaller

9    and make the string of search terms more efficient so that

10   it's less burdensome.

11          But I haven't heard any claim recently that the G2,

12   the nine out and Livevox searches is burdensome at all.

13          And furthermore --

14          THE COURT:  And that was going to be my question to

15   you.

16          What is the difference in burden between your

17   proposal on a statistical sample and doing the G2, nine outs

18   and Livevox --

19          MR. RYAN:  Well --

20          THE COURT:  -- separate from the searchable terms?

21          MR. RYAN:  Your Honor, I will let my ESI liaison

22   handle that, but one caveat.  G2 is not -- there is no G2 in

23   4D.

24          THE COURT:  Okay.

25          MR. RYAN:  So, there's -- that's --

1            MR. BURKE:  That's the Raleigh database --

2            THE COURT:  Right.

3            MR. BURKE:  -- that we don't have much --

4            THE COURT:  Right.

5            MR. BURKE:  -- information about.

6            THE COURT:  One more question, then:  Do you have any

7    sense of where the FCC is on deciding this issue?

8            MR. RYAN:  Your Honor, I checked in and still more

9    district -- I don't know the FCC, but more district courts are

10   still staying it because the FCC is going to rule on this

11   issue.

12           MR. BURKE:  Judge --

13           THE COURT:  But no idea of when?

14           MR. RYAN:  No.

15           MR. BURKE:  As we explained on the motion to stay,

16   because there's a call after notice that it's a wrong number,

17   this case and our whole sub-class falls outside of the scope.

18           THE COURT:  You do not know that, though.  You do not

19   know what the -- none of us can speculate as to what the FCC

20   will do.  That may be true, but I do not think you can stand

21   there and say that with certainty.

22           MR. BURKE:  Well, I can say that the request for

23   public comment is limited to instances where there's no

24   knowledge or no notice that it's a wrong number.

25           MR. RYAN:  Your Honor, that is an oversimplification

1   of what the notice is about.  Because there is a --

2           THE COURT:  We are not going to go back and debate

3   that.  I do not think you can -- anybody can -- make a broad

4   statement about what the FCC is going to do.

5           Go ahead and address the "burdensome" issue and

6   then -- go ahead and address it.

7           MR. CUTLER:  Okay.

8           Pretty much I would have a call with Mr. Forrest and

9   we would agree on which variables they need to see, which are

10  pretty obvious -- the phone number field, the client notes,

11  the debtor notes, et cetera.  So, we would agree to whatever

12  variables they want to see.

13          We would then run the G2s, that are a field that can

14  be looked up.  It's a lookup field.  So, we can go through

15  that and find those and produce a flat file for them.  And,

16  then, they could go take that flat file and put it into any

17  tool they'd want to use it for and do whatever analytics they

18  need to do.

19          MR. RYAN:  But, your Honor, G2 is not located in

20  Raleigh.  And, additionally --

21          THE COURT:  So, what would you do in Raleigh?

22          MR. RYAN:  Your Honor, I would -- what I would do is

23  -- if they're thinking a thousand is not going to be

24  reflective, say a number that's going to be more reflective

25  and I'll produce more accounts as to the random sample.  The

1    ESI liaisons both agree that they could easily write a program

2    to randomly select accounts from our database.

3           MR. PEDERSON:  And going to the burden issue, your

4    Honor, it's one thing to run a search on a lookup field G2 and

5    pull -- identify the accounts that contain that G2 code in the

6    field.  It's another thing to collect and produce and burn to

7    some kind of data storage media all of the free-form notes and

8    other data relating to the accounts contained in this G2

9    indicia.

10          THE COURT:  One more question.

11          You have asked me to stay, and I have not done that.

12   But now that we have learned that some of this data from

13   Livevox becomes compressed, if we stay and you are wrong, then

14   what happens to that data?

15          MR. RYAN:  Well, your Honor, what we could do is get

16   a court order telling Livevox not to compress my client's

17   data.

18          THE COURT:  Have you talked to them to see if --

19          MR. RYAN:  Yes.

20          THE COURT:  -- separate and apart from a court

21   order -- if they will do that --

22          MR. RYAN:  I have talked to them --

23          THE COURT:  -- based on your request since --

24          MR. RYAN:  And I can --

25          THE COURT:  -- you are paying them?

```
1              MR. RYAN:  Yeah.

2              THE COURT:  And my guess is they like your business.

3              MR. RYAN:  Yes.  Yes.

4              I could do that.

5              THE COURT:  Okay.

6              Why don't you make that request of them.  I am not

7     going to put a stay on it now, but why don't you put a request

8     on them.

9              I want some additional time to think about this, and

10    I am going to have you come back.  You have proposed meeting

11    and conferring on some additional issues.  You should do that.

12             I would like you to get that affidavit out, Mr. Ryan,

13    and make the request of Livevox about the compressed

14    material --

15             MR. RYAN:  Yes, your Honor.

16             THE COURT:  -- and have you come back in a couple of

17    weeks.

18             I want to do a little research.

19             (Brief pause.)

20             THE COURT:  I want you to come back in August.

21    August 20th at 10:00 o'clock.  I may issue a ruling before

22    then, and you should have your meet-and-confers before then.

23             Mr. Ryan, you should be prepared to address with the

24    Court the issue of the compressed data from Livevox and have

25    that affidavit turned over in a week.
```

```
 1              MR. RYAN:  Yes, your Honor.

 2              Your Honor, can I make one last caveat?

 3              THE COURT:  Yes.

 4              MR. RYAN:  There's an issue in regards to discovery

 5   other than what the ESI is -- ESI consultants are addressing.

 6   Plaintiff had previously filed a motion to compel.  I have a

 7   motion to compel myself, but I have not filed it.

 8              It was my understanding that we're tabling those

 9   issues, so that we can keep going forward with the ESI.

10              THE COURT:  Yes.  And that was part of what I said in

11   connection with the motion to stay.

12              MR. RYAN:  Okay.

13              THE COURT:  So, August 20th --

14              MR. RYAN:  Thank you, your Honor.

15              THE COURT:  -- at 10:00 o'clock.  I will see you

16   then.

17              MR. PEDERSON:  Thank you, your Honor.

18              MR. MARCO:  And, your Honor, just so we're clear,

19   Mr. Forrest can appear by telephone for that status?

20              THE COURT:  Yes.  Yes, he may.

21              MR. BURKE:  Thank you.

22              THE COURT:  If we need him at that point, he may.

23              MR. RYAN:  Thank you, your Honor.

24              MR. MARCO:  Thank you, your Honor.

25                           *     *     *     *     *
```

1    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

2

3

     /s/ Joseph Rickhoff                     August 5, 2014
4    Official Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25